
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

07 CV 5799

ATTORNEYS FOR PLAINTIFF
CYGNUS TRANSPORT LTD.

JUN 19 2007

U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CYGNUS TRANSPORT LTD.,

Plaintiff,

-against-

PALMYRA SHIPPING & CHARTERING LTD.,

Defendant.

07 Civ. _____ ( _____ )

**VERIFIED COMPLAINT**

---

Plaintiff, Cygnus Transport Ltd. ("Cygnus"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Palmyra Shipping & Chartering Ltd., alleges, upon information and belief, as follows:

1.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all times material herein, plaintiff Cygnus was and is a business entity organized and existing under the laws of Liberia with a place of business at 80 Broad Street, Monrovia, Liberia.

3.      Upon information and belief, Palmyra Shipping & Chartering Ltd. ("Palmyra") is a business entity organized and existing under the laws of the Republic of the Marshall Islands, with a principal place of business at Zug, Switzerland.

4.      On or about March 1, 2007 Cygnus, as owner of the tanker vessel OKLAHOMA (the "Vessel"), and Palmyra, as charterer, entered into a charter party under an amended ASBATANKVOY charter party, to carry a cargo of 80,000 metric tons of fuel oil from 1/2 safe ports in Sicily to 1/2 safe ports in the European Mediterranean (the "Charter").   A true and correct copy of the Charter is annexed as Exhibit 1.

Cygnus' Claim for Demurrage

5.      Total laytime used at the load ports and discharge port exceeded time allowed under the Charter as set forth below:

| | |
|---|---|
| Total laytime used at Augusta | 78 h 34 min |
| Total laytime used at Santa Panagia Bay | 34 h 21 min |
| Total laytime used at STS Gibralter | 105 h 00 min |
| Total laytime: | 217 h 55 min |
| Less laytime allowance | 84 h 00 min |
| **Time on Demurrage** | **133 h 55 min** |

6.      The Charter's demurrage rate is US$27,500 pro rata, which amounts to a total demurrage due to Cygnus of US$153,446.18 from Palmyra.  Deducting a brokerage commission of 2.5%, Palmyra owes Cygnus at total of US$149,610.03 for demurrage.

7.      Palmyra has refused to pay this demurrage claim, although duly demanded.

2

Cygnus' Claim for Diversion Costs

      8.      The Vessel consumed bunkers during a diversion of the Vessel by Palmyra prior to loading.  Cygnus has invoiced Palmyra with respect to these diversion expenses in the amount of US$71,427.77, which are for Palmyra's account in accordance with Charter's Additional Clause 6.

      9.      Palmyra has refused to pay this diversion claim, although duly demanded.


Cygnus' Claim for Shifting Costs at Discharge

      10.      The Vessel consumed extra bunkers worth US$8,470.00 while shifting between the two STS discharge vessels off Gibraltar, and accordingly this expense is for Palmyra's account in accordance with Charter's Additional Clause 39.

      11.      Palmyra had refused to pay these shifting expenses, although duly demanded.


Summary of Claims

      12.      Accordingly, Cygnus claims the following:

| | |
|---|---|
| Diversion costs: | US$ 71,427.77 |
| Shifting costs at discharge: | US$   8,470.00 |
| Demurrage: | US$149,610.03 |
| **Total amount:** | **US$229,507.80** |

      13.      Pursuant to the Charter, the place of arbitration proceedings is London. Accordingly, on or about May 16, 2007, Cygnus commenced arbitration proceedings against Palmyra for its diversion, shifting, and demurrage claims.

14.    Upon information and belief, it will take approximately two years for the arbitration proceeding in London to be concluded.

15.    Under English law, Cygnus also is entitled to reasonable costs and attorneys fees expended while prosecuting its claims to completion, which amount is estimated to be $237,868.77, as set forth below:

| | |
|---|---|
| Interest: | $  37,868.77 ($229,507.80 x 0.0825/year x 2 years) |
| Attorneys' Fees/Expenses: | $ 200,000.00 |
| Total Interest/Fees/Expenses: | $ 237,868.77 |
| Total Due Cygnus | $ 229,507.80 |
| Total Sought with Costs: | **$ 467,376.57** |

16.    Palmyra is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Palmyra Shipping & Chartering Ltd. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Fortis Financial Groups; Banco Popular; or any other financial institution within the Southern District of New York.

17.    While all disputes arising out of the Charter are to be arbitrated in London, England, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, as well as 9 U.S.C. §8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Cygnus demands judgment as follows:

1.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Palmyra Shipping & Chartering Ltd. with the financial institutions noted above in paragraph 16;

2.    That Palmyra Shipping & Chartering Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.    That judgment be entered in favor of Cygnus Transport Ltd. and against Palmyra Shipping & Chartering Ltd. in the amount of US$467,376.57 (including estimated interest, expenses and attorneys' fees); and,

4.    That this Court grant Cygnus Transport Ltd. such other and further relief which it may deem just and proper.

Dated: New York, New York
       June 19, 2007

HOLLAND & KNIGHT LLP

By: _____
    Michael J. Frevola (MJF 8359)
    195 Broadway
    New York, NY 10007-3189
    Tel:    (212) 513-3200
    Fax:    (212) 385-9010

    *Attorneys for Plaintiff*
    *Cygnus Transport Ltd.*

## VERIFICATION

STATE OF NEW YORK           )

                                          :ss.:

COUNTY OF NEW YORK       )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Cygnus Transport Ltd. ("Cygnus"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Cygnus and corresponded with Cygnus' representatives regarding this matter. I am authorized by Cygnus to make this verification, and the reason for my making it as opposed to an officer or director of Cygnus is that there are none within the jurisdiction of this Honorable Court.

_____

Michael J. Frevola (MJF 8359)

Sworn to before me this
19th day of June, 2007

_____

Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 4615084_v1

6

**EXHIBIT 1**

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

# ORIGINAL

CODE WORD FOR THIS
CHARTER PARTY:

**ASBATANKVOY**



# TANKER VOYAGE CHARTER PARTY

### PREAMBLE

London
Place

2007
1st March 2006
Date

IT IS THIS DAY AGREED between *Cygnus Transport Ltd., Monrovia*

~~chartered owner~~/owner (hereinafter called the "Owner") of the *Bahamas flag - built 2006*

**SS/MS "OKLAHOMA"**                                                  (hereinafter called the "Vessel")

and *Palmyra Shipping and Chartering Ltd*                                  (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble

and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.. Description and Position of Vessel: *Managers: Dorian (Hellas) S.A., Piraeus - double hull - vessel fitted SBT/CLS/IGS/COW - LOA 237.71M - beam 42.00m - KTM 49.31m - BCM 116.53m - TPC 89.24 - 1x15mt SWL crane - GT 56,172 - P&I Club: United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited. (See also Q88 as attached).*

Deadweight: *105,465 metric* tons ~~(2240 lbs.)~~  Classed: *Lloyds Register*

Loaded draft of Vessel on assigned summer freeboard *14.85 metres* ft.    ~~in.~~ in salt water.

Capacity for cargo @ 98%: *119,884 m3 including slop tanks.* tons ~~(of 2240 lbs. each)~~          ~~% more or less, Vessel's option.~~

Coated:          [ ] Yes     [X] No

Coiled:          [X] Yes *Alubrass*          [ ] No

Last ~~two~~ *three* cargoes/Charterers: *CPC blend crude/Alba condensate/Fueloil - Litasco/Petrogal/IOOI.*

Now: *arrived Salonika am 1/3/07, ETS 3/3/07* Expected Ready: *ETA Santa Panagia Bay 5/3/07 all going well*

B.   Laydays:

Commencing: *00:01 hours 7th March 2007* Cancelling: *24:00 hours 7th March 2007*

C.   Loading Port(s): *1/2 safe ports Sicily*

Charterer's Option

D.   Discharging Port(s): *1/2 safe ports European Mediterranean not East of but including Greece excluding Albania/Yugoslavia/ former Yugoslavia but including Turkish Mediterranean not North of Aliaga and Syria.*

Charterer's Option

E.   Cargo: *minimum 80,000 metric tons Charterers option upto full cargo - no deadfreight for Charterers account provided minimum quantity supplied - fueloil maximum 2 (two) grades within vessels natural segregation - vessel to maintain loaded temperature upto maximum 135 degrees Fahrenheit - maximum temperature on loading 165 degrees Fahrenheit.*

Charterer's Option

F.   Freight Rate: *Worlscale 105 (one hundred and five) minimum flat loadport(s) Aliaga to apply). Where applicable, freight to be calculated basis West of Sicily laden/Straits of Messina ballast - overage, if any, at 50 percent of agreed rate per* ton ~~(of 2240 lbs. each).~~
                                                                                    metric

**1**

G. Freight Payable *in US Dollars by telegraphic transfer* to: *Owners designated bank account* at

H. Total Laytime in Running Hours: *84 hours SHINC*

I. Demurrage per day: *US Dollars 27,500 per day pro rata*

J. Commission of *1.25*          % is payable by Owner to *Braemar Seascope Limited*

   on the actual amount freight, *deadfreight and demurrage* when and as freight, *deadfreight and demurrage* is paid.

K. The place of General Average and arbitration proceedings to be London   ~~New York (strike out one).~~

L. ~~Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M. Special Provisions: *Palmyra terms 1-55, as amended and attached, together with additional clauses 1-~~11~~, as attached, are deemed incorporated into this Charter Party.*
12


IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:



                                                            By:



Witness the Signature of:



                                                            By:




This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.


2

## PART II

1.    WARRANTY - VOYAGE - CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order; and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owners' and/or Vessel's control excepted, shall load (always afloat), from the tackles of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2.    FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on *bill(s) of lading* intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.    DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.    NAMING LOADING AND DISCHARGE PORTS.

(a)    The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:

ST.KITTS    Carribean or U.S. Gulf loading port(s).
PORT SAID    Eastern Mediterranean or Persian Gulf loading port(s)
(from ports west of Port Said.)

(b)    If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

Place    On a voyage to a port or ports in:
LAND'S END    United Kingdom/Continent (Bordeaux/Hamburg range)
or Scandinavia (including Denmark)
SUEZ    Mediterranean (from Persian Gulf)
GIBRALTAR    Mediterranean (from Western Hemisphere).

(c)    Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall ~~count~~ as used Laytime.

5.    LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by *12:00* 4:00 o'clock P. M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.*If at any time it appears to Owners that the vessel's arrival at the first/sole loading port will be delayed beyond the new cancelling date determined under this clause 5, Owners shall notify Charterers in writing of the date and time that they expect the vessel to be ready to load. If the date and time so notified by Owners falls after the cancelling date then Charterers shall have the option of cancelling this charter which option shall be exercisable within forty-eight (48) hours (Sundays and holidays excepted) of receipt of the said notice from Owners or within twenty four (24) hours after the cancelling date, whichever is earlier. If Charterers do not exercise their option to cancel this charter then the new cancelling date for the purpose of this clause 5 shall be twelve (12) hours after the date and time notified by Owners, or such other date and time as may be mutually agreed.*

6.    NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after *tendering* receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.    HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops *(unless performed concurrently with cargo-handling operations in which case time shall count)*, will not count as used laytime.

8.    DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9.    SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another *or from and then back to the same safe berth* on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.    PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11.    HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Charterer at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12.    DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, duties and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

**3**

13. (**k**). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b)    FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.    (a).    ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b)    If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.    TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a)    Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b)    All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c)    Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d)    Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.    GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17.    (a).    QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b)    FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.    CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.    GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from: any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, per or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent ...ct in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from: Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.    ISSUANCE AND TERMS OF BILLS OF LADING.

(a)    The Master shall, upon request, sign Bills of Lading *as presented* in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b)    The carriage of cargo under this Charter Party and under all Bills of Lading issued for this cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i)    CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii)    JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii)    GENERAL AVERAGE. General Average shall be adjusted, stated and settled *in US Dollars* according to York/Antwerp Rules *1994* 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless ...-wise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, including stomary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being ...... as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv)    BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v)    LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)    WAR RISKS.    (a)    If any port of loading or discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b)    If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c)   The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterer and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii)   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.   LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.   AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.   BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.   ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there *and under the current terms of the London Maritime Arbitrators Association* in term. Before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25.   SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26.   OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily "last or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred..

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by

on board the

wherefore                                                                              Steamship/Motorship
                                                                                       is Master, at the port of

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

~ ~rder on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                                        and                                              , as Charterers, and
all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed                                                                Bills of Lading
of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                        this                           day of

                                                                                                               Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



Palmyra Shipping and Chartering Ltd additional clauses to "Asbatankvoy" Charter Party (Chartering terms effective 15th September 2004)

### 1. Asbatankvoy Charter Party - Deleted

Owners amendments to Asbatankvoy

Part I(G): after "payable" insert "in US Dollars by telegraphic transfer"

Part I(H): insert "84 hours SHINC"

Part I(K): delete "New York"

Part I(I): delete

Part II

Clause 2 line 2: delete "intake" insert "bill(s) of lading"
lines 2-3: delete "as shown ... inspection"
lines 4-5: delete "less any ... insurance thereon"
lines 6-8: delete "The services ... certificate."

Clause 5 line 2: delete "4:00" insert "12:00 P.M."
line 6: after "effect" insert as new sentences "If at any time it appears to Owners that the vessel's arrival at the first/sole loading port will be delayed beyond the new cancelling date determined under this clause 5, Owners shall notify Charterers in writing of the date and time that they expect the vessel to be ready to load. If the date and time so notified by Owners falls after the cancelling date then Charterers shall have the option of cancelling this charter which option shall be exercisable within forty-eight (48) hours (Sundays and holidays excepted) of receipt of the said notice from Owners or within twenty four (24) hours after the cancelling date, whichever is earlier. If Charterers do not exercise their option to cancel this charter then the new cancelling date for the purpose of this clause 5 shall be twelve (12) hours after the date and time notified by Owners, or such other date and time as may be mutually agreed."

Clause 6 line 5: delete "receipt" insert "tendering"

Clause 7 line 9: after "slops" insert "(unless performed concurrently with cargo-handling operations in which case time shall count)"

Clause 9 line 6: after "another" insert "or from and then back to the same safe berth"

Clause 20(a) line 1: delete "in the form appearing below" insert "as presented"

Clause 20(b)(iii) line 1: after "settled" insert "in US Dollars"
line2: delete "1950" insert "1994"

Clause 24 line 4: after "in force" insert "and under the current terms of the London Maritime Arbitrators Association"

**6**



**2.  Worldscale clause:**
Worldscale terms and conditions as in effect on date of this Charter Party to apply (except where lumpsum freight is used).

**3.  Eligibility clause:**
Owners warrant that the vessel is in all respects eligible and not blacklisted or prevented for any reason whatsoever for trading to the ports and places specified within this charter party, and that at all times she shall comply with and have on board all certificates, records and other documents required for such service and as amended by:
- Article VII of the International Convention of Civil Liability, for Oil Pollution Damages of 1969 (CLC certificate)
- Solas Safety Construction and Safety Equipment Certificate.
- International Maritime Organisation (IMO)
- ISM Certificate (as from 1st July 1998)
- ISPS certificate (as from 1st July 2004)

In the event that the vessel does not meet any of the above requirements Charterers/suppliers/ receivers may refuse to berth, discharge or continue to discharge without penalty and/or any delay resulting therefrom shall not count as laytime or if the vessel is on demurrage as time on demurrage and Owners shall indemnify Charterer(s) for any ~~full~~ proven damages or expenses incurred as a consequence of any such breach.

**4.  Cast iron:**
Owners warrant that all riser valves and fittings, outboard of the last rigid support to the vessels deck, that are used in the transfer of cargo or ballast, will be made of steel or nodular iron and that only one steel spacer or reducer will be used between the vessels manifold and the loading arm. the fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold. no hoses of any sort whether inboard or outboard of the last fixed rigid support will be used for the transfer of cargo or ballast **except in emergencies.**

**5.  Lightering/STS clause:**
If lightering/STS is required at any designated port, safe place, or anchorage **which shall always be subject to the Master's approval (not to be unreasonably withheld),** time consumed performing this operation, ~~(including back-loading)~~ shall count as laytime or time on demurrage in either event, time shall commence **upon the vessel's arrival at the location ordered by Charterers and terminate when unmooring has been completed and all of Charterers equipment and personnel have been removed from the vessel. If STS is sole loadport or discharge port then Charterers shall have the benefit of 6 (six) hours notice** ~~six (6) hours after anchoring or whenever the lightering craft is all secure alongside, whichever occurs first.~~ The anchorage, STS or lighterage area shall ~~not~~ be considered as an additional port or berth. Any running time from such lightering area to berth shall ~~not~~ count as laytime or time on demurrage. **All such lighterage/STS operations shall conform to standards not less than those set out in the latest edition of the ICS/OCIMF ship-to-ship transfer guide (petroleum). Charterers shall provide at their time and expense all necessary equipment and personnel for safe lighterage/STS operations including but not limited to booms, craft, fenders, hoses and mooring master.**

7



### 6.  Diversion clause:

Notwithstanding anything else to the contrary in this Charter Party, and notwithstanding what loading and/or discharging ports have been nominated and Bills of Lading issued, discharge port(s) shown in the Bills of Lading not to constitute a declaration of discharge port(s), nor an exercise of option. Charterer shall have the right to change his nomination of loading and/or discharge ports in accordance with Part I clauses C and D hereof. any extra time and expense **(including bunkers)** incurred by Owner in complying with Charterer's orders shall be for Charterer's account and paid at the demurrage rate plus bunkers consumed for maintaining cargo temperature together with freight against Owners' invoice with supporting documents to follow. ~~calculated in accordance with Part II clause 4(c) of this charter~~. Freight shall be paid on the basis of the voyage actually performed. Charterers shall have the right to make as many changes as they seem necessary.

### 7.  Blending clause - Deleted

### 8.  Discharge/re-load clause - Deleted

### 9.  Pour point depressant clause - Deleted

### 10.  In transit loss clause:

Owners will be responsible for the full amount of any in transit loss, if any in transit loss exceeds ~~0.25~~ 0.5 percent and Charterers will have the right to **claim from Owners** ~~deduct from freight~~ an amount equal to the FOB port of loading value of such loss plus freight and insurance due with respect thereto.

### 11.  Clean ballast clause:

Vessel to arrive at load port with clean ballast. No freight on slops, or deadfreight caused by slops. Ballasting/deballasting time not to count even if on demurrage unless concurrent with loading/discharging operations. Any expenses and/or time lost as a result of the vessel failing to complete deballasting operations within a period of 6 hours shall be borne by the Owners.

### 12.  Pumping clause:

Owners warrant that the vessel is able to discharge the ~~entire~~ cargo within twenty-four hours **at a single discharge port or within eighteen hours at each discharge port if more than one** or capable of maintaining **a** an average backpressure of 100 p.s.i (7.0 kg/sq.cm) at the manifold (except when stripping, draining, changing grades/pumps, crude oil washing) providing shore facilities permit **and/or are capable of receiving same within such time or at such pressure.** ~~In case the vessel fails to comply with the above said requirement, Owners to pay for any overtime expenses, expenses to Charterers" and/or others" surveyors or to receivers, excess quay dues and wharfages and port disbursements at uniform tariffs ruling at each port of discharge as per the original invoices presented.~~ If shore facilities do not permit discharge within the agreed time, then master to issue a letter of protest and to have same counter-signed by the terminal showing manifold pressure, pump room pressure and RPM any internal stripping and any start/stop time **provided signatures are readily available and no delay is incurred.**



If vessel fail to maintain its pumping warranties or need to be repaired and as a result of such causes and events the vessel loses its turn to berth, laytime and demurrage shall be suspended until regains the same berthing position. if such causes or events occur while vessel is in berth, extra expenses thereby incurred **directly** by Charterers in connection with the vessel remaining at the berth shall be for Owners'' account and Charterers shall also have the option to order the vessel out of berth, so as to avoid delay to other vessel waiting to use the berth, with the cost of unberthing and reberthing for this purposes to be for Owners account. time lost in between berthing shall not count as laytime or demurrage.


### 13.   NOR clause - Deleted


### 14.   ETA clause:
**Provided time permits** vessel to give eta notices in accordance with Charterer's voyage instructions and at least 96/72/48/24/12 hours prior arrival at load and discharge ports. when such eta notices are not given, any delay at either load or discharge port(s) resulting from ETA notices not being sent to be for Owners'' account even if vsl is already on demurrage.


### 15.   Texaco Shore Release clause:
**Time spent awaiting cargo documents and / or awaiting vessel release by shore authorities or cargo inspector after disconnection of hoses in excess of three (3) hours shall count as laytime or, if the vessel is on demurrage, as time on demurrage.**


### 16.   Waiting for orders clause:
Charterers to have the liberty of instructing the vessel to wait for orders at a safe place **upto a maximum of five (5) days, with time to count at demurrage rate plus bunkers consumed for maintaining cargo temperature and staying adrift all being paid together with freight** . ~~Time used to count as used laytime and if on demurrage, as demurrage.~~


### 17.   Adherence to voyage instructions:
Owners are responsible for master's/vessel's non compliance with **timely** voyage orders given under this Charter Party, **provided that they are in accordance with the terms and conditions thereof,** and any time lost as a result of failure to comply not to be for Charterers account.


### 18.   Highbury Early Loading clause
**If, upon Charterers' instructions, the vessel tenders notice of readiness or loads earlier than commencement of laydays, then Charterers shall have the benefit of such time saved when calculating laytime and/or demurrage. Such benefit shall be half the time between tendering notice of readiness or making all fast, whichever occurs first, with laytime and/or demurrage thereafter commencing to run in accordance with this charter, until the commencement of the original laydays.**


### 19.   Free practique clause - Deleted



### 20.  Excess berth occupancy:

If after the disconnection of hoses, the vessel remains at berth exclusively for vessel's purposes, other than by reason of force majeure, **or ballasting** the Owner will, at the terminal's option, be responsible for all direct ~~or indirect~~ costs charged to Charterer by the terminal, the suppliers, or the receivers or alternatively shall be required to vacate the berth immediately upon terminals request.


### 21.  Hose connections:

**It is understood that Owners crew will assist with the connection of hoses on board.**


### 22.  Claims clause:

Charterers shall be discharged and released from all liabilities in respect of claims Owners may have under this charter party (such as, but not limited to, claims for freight, deadfreight, demurrage, shifting expenses or port expenses and/or any charges or expenses under this charter party) unless claim has been presented to Charterers in writing with all supporting documents within **80 (eighty)** ~~sixty (60)~~ days **in respect of demurrage claims and 180 (one hundred and eighty) days in respect of all other claims** from completion of discharge under this charter party. in all cases Owners shall provide supporting documentation duly signed by master and shippers/receivers respectively or agents **as available.**

With respect to demurrage claims, Owners shall present any such claims together with documents sufficient to support the claim which should include, but not be limited to, the following documentation :

- Commercial invoice
- Laytime statement
- Notice of readiness
- All statement of fact(s) including the terminal statement of facts/time sheet duly signed by master
- All note(s) of protest issued by the vessel
- All note(s) of protest received by the vessel
- Hourly pressure log recorded at each manifold countersigned by terminal, **if available**
- ~~Any other relevant documentation~~

Owners further agree that with respect to any claim or other unresolved dispute arising out of this charter other than demurrage claim, unless arbitration or litigation, as per this charter is commenced within **2 (two) years** ~~(1) one year~~ after completion of discharge or the date when discharge should have completed, such claim or other dispute is waived and all liability which respect thereto is discharged.

This clause does not apply to claims for damage, loss or short delivery of cargo.


### 23.  Bill of Lading clause:

Bills of Lading to be marked "clean on board" if required by Charterers. discharge port shown in the Bill of Lading not to constitute a declaration of discharge port and Charterers to have right to order vessel to any port within terms of the charter party. Charterers will issue l.o.i as per Owner's P&I wording to indemnify Owners against claims brought by holders of Bills of Lading against Owners by reason of change of destination.

**10**



Owners agree to instruct the master to discharge the cargo against a 1/3 original Bill of Lading. If such Bill of Lading has been placed on board the vessel at load port, master shall sign receipt for same and release it to receivers via appointed agents at discharge port. if no such original Bill of Lading is available at discharge port, then Owners to permit discharge against Owners" P&I Club wording and such letter to be signed by Charterers. P&I Club wording is to include clause cancelling the Letter of Indemnity against presentation either of 1/3 original bill of lading or of 3/3 originals Bills of Lading and Owners undertaking to return 2/3 originals Bills of Lading plus Owners receipt for 1/3 original Bill of Lading marking such Bill of Lading "voyage accomplished null and void" or after 13 (thirteen) months after completion of discharge, whichever occurs first, provided that no legal proceedings have been instituted against Owners within such 13 (thirteen) months.

**24.  Canal clause - Deleted**

**25.  Compliance clause - Deleted**

**26.  Part cargo clause - Deleted**

**27.  Sampling clause:**
Charterers shall be at liberty to order the vessel to call at a port en route or approximately en route from load port to discharge port(s) for sampling purposes. Charterers shall then pay all expenses and all port disbursements where applicable (except for eventual ship/crew supplies and expenses) and all time lost to **be paid at demurrage rate plus bunkers consumed together with freight against Owners invoice with supporting documents** ~~count as used laytime or time on demurrage~~, if vessel is on demurrage. Charterers will make accordingly direct arrangements with their agents who shall handle ship's call. ~~Any additional costs due to the vessel calling for sampling purposes to be calculated according to Part II, clause 4C, of this charter.~~

**28.  Over age insurance clause - Deleted**

**29.  Bunker survey clause:**
Owners allow, if requested, Charterers independent inspectors to survey bunkers on vessel at loading and discharging port(s), as well at eventual interim port(s) of call, with extra time, if any, to count as laytime **at Charterers risk and expense.**

**30.  Heating clause:**
The Owners warrant that the vessel is fully coiled and undertakes to maintain cargo at loaded temp, but maximum 135 F, throughout voyage and discharge. ~~Owners further warrant that the vessel is capable of heating the cargo to such temperature as agreed to in charter fixture between Owners and Charterers by about 3 deg C per day, and such temperature is to be maintained throughout the entire discharge. should Charterers require vessel to heat up as above they will reimburse Owners US Dollars 2000 for each 3 deg C of cargo increased temperature.~~



If the vessel fails to maintain the **loaded** temperature, ~~required,~~ Owner shall be responsible for any resulting delays and all time lost. Further, Charterers shall have the right to order vessel to be withdrawn from berth and all time and expenses incurred shall be for Owners account.

### 31. Inert gas gauging clause:

If the vessel is equipped with an inert gas system and the cargo compartments are inerted, Charterers or independent inspectors shall have the right to request the master to depressurize for the purpose of sampling, gauging, temperature determination and or determination of the quantity remaining on board after discharge.

Depressurization is to be conducted safely in accordance with the provisions of the international safety guide for oil tankers and terminals (ISGOTT) as issued by the International Chamber of Commerce (ICC) and the Oil Companies International Marine Forum (OCIMF). **All time incurred in complying with these requests shall count as laytime or, if the vessel is on demurrage, as time on demurrage, and all extra bunkers consumed shall be for Charterers account.**

### 32. P&I Club clause:

Owners warrant that the vessel is entered with a P&I Club of good standing, member of the International group of P&I Clubs and will remain so throughout the course of the charter.

### 33. Speed clause:

Owners warrant that the vessel will perform this voyage at an average speed of ~~13~~ 14 knots weather and safe navigation permitting.

### 34. Derricks clause:

Vessel is fitted with derricks capable of lifting and supporting at the vessel's port and starboard manifolds heavy submarine hoses of up to 10 metric tons in weight.

### 35. Stern discharge clause - Deleted

### 36. Dying clause - Deleted

### 37. Drug and alcohol clause:

Owners warrant that it has an Exxon drug and alcohol policy or a policy of drug and alcohol abuse ("policy") applicable to the vessel which meets or exceeds the standards in the OCIMF guidelines for the control of drugs and alcohol on board ship. Owner further warrants that this policy will remain in effect during the term of this charter and that Owners shall exercise due diligence to ensure that the policy is complied with.

**12**



**38.  Cargo retention clause:**
In the event that any cargo remains on board upon completion of discharge. Charterer shall have the right to ~~deduct from freight~~ **cliam from Owners** an amount equal to the fob port loading value of such cargo plus freight due with respect thereto, provided that the volume of cargo remaining on board is liquid and pumpable **and reachable by the vessel's fixed equipment** as determined by **two independent surveyors, one appointed/paid by Owners and the other by Charterers** ~~an independent surveyor.~~ any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

If the vessel is ex lay-up, dry dock or ex dry cargo, a value of cargo as well as freight and insurance for any short outturn cargo quantity (as determined by comparing the Bill of Lading quantity versus the discharged quantity basis shore tank gauges), shall be deducted from freight to the extent that such quantity exceeds 0.3 percent of the bill of lading quantity.

~~Any action or lack of action in accordance with this provision shall be without prejudice to any other rights or obligations of the parties. For the purposes of this clause any surveyor who is iso 9002 certified shall be considered as acceptable to both Charterer and Owner.~~

**39.  Hess shifting/deballasting clause:**
If more than one berth at load or discharge port is used, shifting expenses to be for Charterers account, except that shifting expenses from anchorage to first berth will not be for Charterers account.

**40.  Additional oil pollution insurance clause:**
**Owners warrant that they have and will maintain throughout the period of this charter the standard oil pollution insurance cover (currently US Dollars 1 billion) available from their P&I Club.**

~~a) the standard oil pollution insurance cover (currently usd 1 billion) available from their P&I Clubs, and~~

~~b) any additional oil pollution insurance cover which becomes available via their P&I Club or through underwriter providing first class security.~~

If requested by Charterers Owners to provide Charterers with evidence of cover.

**41.  ITF clauses:**
Owners warrant that the vessel/crew will remain in compliance  with the requirements of ITF. or equivalent during the currency of this Charter Party.  Any delay and/or expense resulting from non-compliance with this warranty shall be for Owners account and time not to count as laytime or demurrage.

**13**



**42.  ISM (International Safety Management) clause:**
Owners warrants that a "safety management system" (sms) in accordance with the ISM code will be in operation throughout the duration of this charter. it is a condition of this Charter Party that on and after july 1998 the Owner(s) or"the company" (as defined by the ism code) shall have a valid "Document of Compliance" (DOC) and the vessel shall have a valid "Safety Management Certificate" (SMC). Upon request the Owner(s) shall provide a true copy of the relevant doc and sms to the charter.


**43.  ISPS clause - Deleted**


**44.  Cleaning:**
Owners warrant that vessel's lines/pumps, tanks and pumps shall be in all ways suitable for loading Charterers cargo to Charterer's inspector's satisfaction. if vessel is found to be unsuitable, she will be cleaned until approval is obtained from Charterer's inspector. Any delays and coSTS as a result of vessel arriving at loading port and not being to Charterer's satisfaction shall be for Owners account.  If further cleaning is necessary, and if 36 hours after first inspection by Charterer's inspector the vessel is still unsuitable, Charterer shall have the option to cancel the Charter Party. Cancellation or failure to cancel shall be without prejudice to any claims for damages Charterer may have against the Owner.


**45.  COW operations clause:**
Owners warrant that the vessel is equipped with a crude oil washing system in good working order and that the master, officers and crew are competent to operate said system. if requested by Charterers vessel shall perform cow in accordance with the procedures described in the ISC/ OCIMF, in all cargo tanks at discharging port(s) simultaneously with cargo discharging operations. any additional time spent by reason of cow shall count as used laytime up to maximum 8 hours Owners warrant that officers and crew are experienced in COW operation. Expenses for COW, if any, to be for Owner's account.


**46.  Conoco weather clause:**
**Except for the specified places,** delays in berthing for loading or discharging and any delay after berthing, which are due to weather conditions shall count as one half laytime or, if any demurrage, at one half demurrage rate.


**47.  Commission:**
2.50% address commission to Palmyra Shipping & Chartering Ltd on **freight, deadfreight and demurrage** ~~all monies earned~~ (deductable at source).


**48.  P&C clause:**
Negotiations and fixture to remain strictly private and confidential.

**14**



**49.   Seacock valves:**
Seacock valves to be sealed at loading port before commencing loading in presence of Charterers"
representative and seal not be broken until completion of discharge.


**50.   Usual protective clauses:**
Chamber of Shipping War Risks clauses to apply to this charter party, and all Bills of Lading issued
under this Charter Party,   shall contain the New Jason Clause, both to blame collision clause and
clause paramount.


**51.   Extra war risk clause – Deleted**

**52.   Third party arrest clause - Deleted**


**53.   Texaco ITOPF clause:**
Owner warrants that it is a member of the International Tanker Owners Pollution Federation (ITOPF) and
that Owner will retain such membership during the entire period of this charter. Owner further warrants
that vessel shall, during the period under this charter, be in full compliance with the 1969 Civil Liability
Convention (CLC), the 1971 Fund Convention (Fund Convention) and all associated protocols as updated
and amended and that vessel has a valid CLC certificate on board.


**54.   Laytime/demurrage clause:**
Notwithstanding the provision of any other paragraph of this clause, or any other clause of this charter
party to the contrary, the following time shall not count as laytime or, if vessel is on demurrage, as time
on demurrage as per charter party agreement

A.    All time between early arrival NOR at load port, and ~~0600~~ 00:01 (local time) on the first day of
laydays or actual commencement of loading, whichever first occurs, unless  Charterers grants approval
beforehand;
B.    All time shifting from anchorage to berth ~~or STS lightering site;~~
C.    ~~All time shifting from STS lightering site to anchorage or to berth;~~
D.    All time spent discharging ballast water or slops, unless concurrent with cargo operations;
E.    ~~All time spent waiting custom, immigration clearance, and pratique;~~
F.    All time lost due to improper operation of the inert gas system;
G.    ~~All time lost due to awaiting daylight, tide, fog, tugs or pilot, or due to quarantine;~~
H.    All time for bunkering a vessel, taking or discharging ballast water, discharging slops or vessel-
generated wastes, reconfiguring barges in a tow, cleaning vessel compartments, unless concurrent with
cargo operations;
I.    ~~All time after forty-five (45) minutes of completion of discharge of cargo, whereby all hoses are to be
disconnected promptly from vessel, unless Charterer/shipper/receiver detains the vessel;~~
J.    All time spent for excess berthing, and expenses for such solely for vessel's purpose;
K.    All time for delay for non-compliance with law and regulations warranty, and insurance compliance.

~~The principle of "once on demurrage, always on demurrage" shall not be deemed applicable to this charter
party;  only time which would count as used laytime under the terms hereof prior to the expiration of
allowed laytime, shall count as time on demurrage once allowed laytime has expired.~~



~~55.  BIMCO ISPS Clause for Voyage Charter Parties~~

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this ~~Clause, the other party shall indemnify the paying party.~~

**16**

55. **ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005**

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

**(ii)** Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

**(c)** Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

**(i)** Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

**(ii)** Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

**(d)** Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(e)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**17**



## ADDITIONAL CLAUSES

1.  To the best of Owners knowledge (but always without guarantee ~~omissions excepted~~) the vessel is acceptable to: BHP/BP/Chevron/Conocophillips/ExxonMobil/Petronas/Shell/Total.
    *or engagement*

2.  Vessel to re-measure to 71,500 metric tons ~~on~~ deadweight draft 11.00 metres ~~basis~~ api 14.4, sg 0.970 and temperature 100 Fahrenheit, maximum intake fuel oil: about 70125 metric tons or about 455747 barrels at 60 degrees Fahrenheit.
    *on                Basis*

3.  If STS, all port costs including agency to be for Charterers account and to be settled directly by them.

4.  Freight always payable basis minimum 80,000 metric tons irrespective of api's/splits/ temperatures of the cargo loaded and/or the quantity of cargo loaded to any draft restrictions.

5.  If vessel loads/discharges at Ancona, Castellon, Falconara, Fiumicino, Gaeta, Gela, Genoa, Gulf of Iskenderun, La Nouvelle, La Spezia, Ravenna, Savona, Tarragona, Trieste or Venice or ~~by~~ at/by STS/lightering or at any SBM/SPM/MBM/FSO/FPSO/sealine/open sea berth/ offshore facility, location, platform, structure or terminal, time to count in full weather and/or sea conditions permitting or not. Any shifting, unberthing(s) and/or reberthing(s) due to weather and/or sea conditions to be for Charterers' account and to be settled directly by them, and all time so spent to count in full.

6.  Any additional war risk premium for hull and machinery, LOH and crew (as invoiced by Owners' underwriters) as at date of Charter Party and payable as a result of vessel trading into war and/or war-like territories, to be for Charterers account, and same to be reimbursed promptly after receipt by Charterers of supporting evidence from Owners underwriters. The vessel's insured value for war risks is US Dollars 90,000,000.00

7.  Any charges and/or dues and/or levies and/or taxes on cargo and/or freight (howsoever based and/or calculated) to be for Charterers account and to be settled directly by them.

8.  Escort / fire-fighting / pollution-guard / stand-by launches / tugs / workboats, or equivalent, and any related charges to be for Charterers account and to be settled directly by them.

9.  Any additional insurance by virtue of the vessel's age and / or class and / or flag and / or ownership to be for charterers' account and to be settled directly by them.

**18**



10.  Discharge ports to be in geographical rotation.


11.  Tankpac Worldscale Clause
In situations where certain expenses have not been accounted for in the Worldscale flat rate, and Worldscale page d-8 calls for specific allocation in the contract, such expenses shall be for Charterers account.

12.  As Charterers require the vessel to present at the first / sole loadport with her cargo tanks water-washed and ready to load a cargo of fuel oil, Charterers agree to pay for all costs of water-washing and other cleaning including but not limited to bunkers consumed, disposal of tank-washings, port charges / costs / expenses / fees of whatsoever nature incurred in respect of tank-washings and deviation (if any), all to be paid together with freight against Owners invoice with supporting documents.

**19**

14



**QUESTIONNAIRE 88 (Version 2)**

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
*(Metric system to be applied, HVPQ reference specified where applicable)*

| GENERAL INFORMATION | | HVPQ |
|---|---|---|
| Date Updated: | | |
| Vessel's name: | "OKLAHOMA" | 1.2 |
| IMO number: | 9321964 | 1.3 |
| Vessel's previous name(s): | N/A | 1.4-1.7 |
| Flag: | Bahamas | 1.8 |
| Port of Registry: | Nassau | 1.9 |
| Call sign: | C6VR8 | 1.11 |
| Inmarsat phone number: | 764647450 / 1 | 1.12 |
| Fax number: | 784647452 | 1.13 |
| Email address: | C6VR8@globeemail.com | 1.16 |
| Type of vessel: | Crude Oil Tanker | 1.17 |
| Type of hull: | Double Hull | 1.19 |

| OWNERSHIP & OPERATION | | |
|---|---|---|
| Registered owner - Full Style: | Cygnus Transport Ltd<br>80 Broad Street<br>Monrovia<br>Liberia | 1.20 |
| Technical operator - Full Style: | Dorian (Hellas) S.A.<br>102-104 Kolokotroni St<br>Piraeus 185 35<br>Greece | 1.22 |
| Commercial operator - Full Style: | Dorian (Hellas) S.A.<br>102-104 Kolokotroni St<br>Piraeus 185 35<br>Greece | 1.25 |
| Disponent owner / Bareboat charterer - Full Style: | N/A | |
| Number of vessels in Disponent owner's fleet:: | N/A | |

| BUILDER | | |
|---|---|---|
| Where Built : | SHIME's Yokosuka Shipyard, Japan | 1.26 |
| Date Delivered: | 15.09.06 | 1.31 |

| CLASSIFICATION | | |
|---|---|---|
| Vessel's classification society: | Lloyd's Register | 1.34 |
| Class notation: | +100A1 Double Hull Oil Tanker, ESP, ShipRight (SDA, FDA, CM), LI, +LMC, UMS, IGS | 1.35 |
| If Classification society changed, name of previous society? | N/A | 1.36 |
| If Classification society changed, date of change? | N/A | 1.37 |
| Last dry-dock: | N/A | 1.38 |
| Last special survey: | N/A | 1.41 |
| Latest CAP Rating (if applicable) | N/A | 1.44 |
| Last annual survey: | N/A | 1.45 |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | N/A | |

**20**



**DIMENSIONS**

| LOA (Length Over All): | | 237.71 Metres | 1.49 |
|---|---|---|---|
| Extreme breadth: | | 42.00 Metres | 1.51 |
| KTM (Keel to Masthead): | | 49.31 Metres | 1.54 |
| BCM (Bow to Center Manifold): | | 116.53 Metres | 1.57.1 |
| Lightship parallel body length: | | 73.01 Metres | 1.57.3 |
| Normal ballast parallel body length: | | 105.27 Metres | 1.57.6 |
| Parallel body length at Summer DWT: | | 121.17 Metres | 1.57.9 |

**TONNAGES**

| Net Tonnage: | 32,082 | 1.59 |
|---|---|---|
| Gross Tonnage: | 56,172 | 1.60 |
| Suez Net Tonnage: | 54,083.50 | 1.61 |
| Panama Net Tonnage: | N/A | 1.62 |

| LOADLINE INFORMATION | Freeboard (Metres) | Draft (Metres) | Deadweight ( | Displacement ( | |
|---|---|---|---|---|---|
| Summer: | 6.467 | 14.85 | 105.465 | 121.637 | 1.63 |
| Winter: | 6.776 | 14.569 | 102.547 | 118.719 | 1.64 |
| Tropical: | 6.158 | 15.187 | 108.065 | 124.237 | 1.65 |
| Lightship: | 18.925 | 2.42 | 0 | 16.172 | 1.66 |
| Normal Ballast Condition: | 14.995 | 6.35 | 31.619 | 47.791 | 1.67 |

| TPC on summer draft: | 89.24 | 1.70 |
|---|---|---|
| Does vessel have Multiple SDWT? | Yes | 1.72 |
| If yes what is the maximum assigned Deadweight? | 99,995 Tonnes | 1.73 |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | 42.50 Metres | 1.74 |

**RECENT OPERATIONAL HISTORY**

| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description: | No | 1.77-1.79 |
|---|---|---|

**CERTIFICATION**

| Owners warrant following certificates to be valid throughout the Charter Party period: | | |
|---|---|---|
| SOLAS Safety Equipment: | Yes | 2.2 |
| SOLAS Safety Radio: | Yes | 2.3 |
| SOLAS Safety Construction: | Yes | 2.4 |
| Load line: | Yes | 2.5 |
| IOPPC: | Yes | 2.6 |
| Safety Management (ISM): | Yes | 2.8 |
| USCG COC: | Yes | 2.11 |
| CLC: | Yes | 2.13 |
| US COFR: | Yes | 2.15 |
| Certificate of Fitness (Gas/Chemicals): | N/A | 2.16 & 2.17 |
| Certificate of Class: | Yes | |
| ISPS ISSC: | Yes | |

**DOCUMENTATION**

| Does the vessel have the following documents on board? | | |
|---|---|---|
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes | 2.28 |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | Yes | 2.31 |
| Is the vessel entered with ITOPF? | Yes | |



**CREW MANAGEMENT**

| | | |
|---|---|---|
| Nationality of Master | Croatian | |
| Nationality of Officers: | Croatian / Filipino | 3.1 |
| Nationality of Crew: | Filipino | 3.2 |
| If Officers/Crew employed by a Manning Agency - Full Style: | Senior Officers:<br>1) Pasat Shipping Services Limited Obala Hrvatske Momarice 1 PO BOX 142 22000 Sibenik-Croatia Tel: +385 22213750 Fax: +385 22213751<br>Junior Officers / Crew:<br>2) Magsaysay Maritime Corporation/Magsaysay Bldg., 520 T.M Kalaw St. Ermita (1000), Manila Philippines Tel: +63 25269674 Fax: +63 23026160 | 3.1 & 3.2 |
| What is the common working language onboard? | English | 3.1 |
| Do key officers understand English? | Yes | |
| In case of Flag Of Convenience (FOC), is the ITF Special Agreement on board? | Yes | |

**STRUCTURAL CONDITION**

| | | |
|---|---|---|
| Are cargo tanks coated? | In part | 7.1 |
| If Yes, specify type of coating: | Modified epoxy paint | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | Tank Top Area and 2.0 Metres above plus Under Deck Area and 2.0 Metres below | 7.1.3 |
| Are slop tanks coated? | Yes | |
| If slop tanks are coated, specify to what extent: | In full | |

**CARGO & BALLAST SYSTEMS**

| | | |
|---|---|---|
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks? | Yes | 8.2 |
| Groups / Tank Capacities | 1. P&S 16,161.6<br>2. P&S 20,802.4<br>3. P&S 20,861.2<br>4. P&S 17,384.4<br>5. P&S 20,861.2<br>6. P&S 19,501.2 | 8.3 |
| Total cubic capacity 98% ex slop tank: | 115,572.00 M3 | 8.4 & 8.6 |
| Slop tank(s) capacity 98%: | 4,312.00 M3 | 8.5 & 8.7 |
| SBT or CBT? | SBT | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 37 per cent | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | Yes | 8.14.3 |
| Number of natural segregations with double valve: | 3 | 8.15 |

**CARGO PUMPS**

| | | |
|---|---|---|
| Type: | Centrifugal | 8.18-8.25 |
| Number: | 3 | 8.18-8.25 |
| Capacity: | 2.500 (each) Cu. M/Hour | 8.18-8.25 |

**GAUGING AND SAMPLING**

| | | |
|---|---|---|
| Can tank innage/ullage be read from the CCR? | Yes | 8.48 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes | 8.51 |
| Type of tank gauging system (radar / floating / other) | Floating | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |

22



| VAPOUR EMISSION CONTROL AND VENTING | | |
|---|---|---|
| Is a vapour return system fitted? | Yes | 8.65 |
| State what type of venting system is fitted: | Common vent system | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 7500 Cu. M/Hour | 8.79 |
| **CARGO MANIFOLDS** | | |
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes | 8.80 |
| What is the number of cargo connections per side? | 3 | 8.83 |
| What is the size of cargo connections? | 0.450 Metres | 8.84 |
| What is the material of the manifold? | Steel | 8.86 |
| Distance between cargo manifold centres: | 2.500 Metres | 8.93 |
| Distance ships rail to manifold: | 4.522 Metres | 8.95 |
| Distance main deck to centre of manifold: | 1.900 Metres | 8.97 |
| Height of manifold connections above the waterline at loaded (Summer Deadweight) condition? | 8.35 Metres | 8.101 |
| Height of manifold connections above the waterline in normal ballast? | 16.90 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | No | 8.104 |
| Number / size reducers: | 3 / 400 MM to 300 MM<br>3 / 400 MM to 250 MM<br>3 / 400 MM to 200 MM | 8.106-8.110 |
| **CARGO HEATING** | | |
| Type of cargo heating system? | Heating coils | 8.120 |
| Material of heating system? | AluBrass | 8.128 |
| Max load temp: | 70 deg Celsius | |
| Max temp maintain: | 40 deg Celsius | |
| **IGS & COW** | | |
| Is an Inert Gas System (IGS) fitted? | Yes | 9.1 |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | Flue gas | 9.3 |
| Is a Crude Oil Washing (COW) installation fitted? | Yes | 9.17 |
| **MOORING ARRANGEMENTS** | | |
| Number / length / diameter / breaking strength of wires: | On Drums | |
| Focsle: | 4 / 220 / 38 MM / 93 Tonnes | 10.2 |
| Main deck fwd: | 4 / 220 / 38 MM / 93 Tonnes | 10.3 |
| Main deck aft: | 2 / 220 / 38 MM / 93 Tonnes | 10.4 |
| Poop: | 6 / 220 / 38 MM / 93 Tonnes | 10.5 |
| Number / length / diameter / breaking strength of ropes: | On Drums | |
| Focsle: | | 10.11 |
| Main deck fwd: | | 10.12 |
| Main deck aft: | | 10.13 |
| Poop: | | 10.14 |
| | Other Lines | |
| Focsle: | 2 / 220 / 72 MM / 90 Tonnes | 10.15 |
| Main deck fwd: | 2 / 220 / 72 MM / 90 Tonnes | 10.16 |
| Main deck aft: | 2 / 220 / 72 MM / 90 Tonnes | 10.17 |
| Poop: | 2 / 220 / 72 MM / 90 Tonnes | 10.18 |

| Number and brake holding power of winches: | | |
|---|---|---|
| Focsle: | 2 / 470 KN | 10.22 |
| Main deck fwd: | 2 / 470 KN | 10.23 |
| Main deck aft: | 1 / 470 KN | 10.24 |
| Poop: | 3 / 470 KN | 10.25 |
| How many closed chocks and/or fairleads of enclosed type are fitted on: | | |
| Focsle: | 12 | |
| Main deck fwd: | 8 | |
| Main deck aft: | 8 | |
| Poop: | 12 | |

## SINGLE POINT MOORING (SPM) EQUIPMENT

| | | |
|---|---|---|
| Fairlead size: | 600 MM x 450 MM | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | Yes | 10.60 |
| Is vessel fitted with chain stopper(s)? | Yes | 10.61 |
| Number: | 2 | 10.61.1 |
| Type: | Tongue Type | 10.61.2 |
| SWL: | 200 Tonnes | 10.61.3 |
| Max diameter chain size: | 76 MM | 10.62 |

**LIFTING EQUIPMENT**

| | | |
|---|---|---|
| Derrick(s) - Number / SWL: | N/A | 10.75 |
| Crane(s) - Number / SWL: | 1 x 15 Tonnes | 10.76 |

**ENGINE ROOM**

| | | |
|---|---|---|
| What type of fuel is used for main propulsion? | I.F.O (380 CST) | 12.5 |
| What type of fuel is used in the generating plant? | I.F.O (380 CST) | 12.14 |

**MISCELLANOUS**

| | | |
|---|---|---|
| P & I Club name: | United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited | |
| Last three cargoes (Last / 2nd Last / 3rd Last): | | |
| Last three charterers (Last / 2nd Last / 3rd Last): | | |
| Last three voyages (Last / 2nd Last / 3rd Last): | | |
| Date of last SIRE Inspection: | N/A | |
| Date of last CDI Inspection: | N/A | |
| Current Oil Major Company Acceptances (TTBOOK but AWOGOE): | BHP BP Chevron ConocoPhillips ExxonMobil Petronas Shell Total | |
| Date and place of last Port State Control: | N/A | |
| Any outstanding deficiencies as reported by any Port State Control? | No | |
| If yes, provide details: | | |

| | | |
|---|---|---|
| | | |
| FOR USA CALLS ONLY | | |
| Qualified individual (QI) - Full Style: | O'Brien's Oil Pollution Service, Inc<br>Tel: +1-985-781-0804<br>Fax +1-985-781-0580<br>E-mail: oops-usa@oopsusa.com | |
| Oil Spill Response Organization (OSRO) - Full Style: | National Response Corporation<br>Tel: +1-631-224-9141<br>       +1-800-899-4672<br>Fax +1-631-224-9086<br>E-mail: iocdo@nrcc.com | |
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | Yes | |

E+OE                                        Revised: July 2004 (INTERTANKO.com / Q88.com)





London, 16th March 2007

## "OKLAHOMA"

## CHARTER PARTY DATED 1ST MARCH 2007

### ADDENDUM NUMBER ONE

It is this day mutually agreed between **Cygnus Transport Ltd., Monrovia** (Owner) and **Palmyra Shipping and Chartering Ltd** (Charterers) to:

insert "and Gibraltar" in the included ports in the discharge range.

All other terms, conditions, exceptions and exemptions to remain unaltered and in full force and effect.

OWNERS:                                      CHARTERERS:
**Cygnus Transport Ltd., Monrovia**          **Palmyra Shipping and Chartering Ltd**
**Bar, Switzerland** ─────────────────➤

**26**